**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 22-12537 |
| ILLINOIS VALLEY CELLULAR RSA 2-I, LLC *et al.* | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | Hon. Timothy A. Barnes |
| | ) | |
| | ) | |

**DEBTORS' FIRST AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**
**DATED FEBRUARY 24, 2023**

**FREEBORN & PETERS LLP**
Shelly A. DeRousse
Jason J. Ben
Elizabeth L. Janczak
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677
Telephone: (312) 360-6000
Facsimile: (312) 360-6250
sderousse@freeborn.com
jben@freeborn.com
ejanczak@freeborn.com
*Counsel for the Debtors*

---

[1] The Debtors' federal tax identification numbers are: Illinois Valley Cellular RSA 2-I, LLC (58-1918886) and Illinois Valley Cellular RSA 2-II, LLC (36-3694797).

# TABLE OF CONTENTS

Page

ARTICLE I INTRODUCTION, DISCLOSURES, DEFINITIONS, INTERPRETATION
    AND EXHIBITS..........................................................................................................1

    Section 1.01    Introduction.............................................................................................1

    Section 1.02    Disclosures..............................................................................................1

    Section 1.03    Background of Subchapter V Case.........................................................2

    Section 1.04    Definitions.............................................................................................12

    Section 1.05    Rules of Interpretation and Computation of Time.................................16

    Section 1.06    Exhibits..................................................................................................17

ARTICLE II UNCLASSIFIED CLAIMS ...............................................................................17

    Section 2.01    Unclassified Claims. ..............................................................................17

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS ...................................17

    Section 3.01    Classified Claims. ..................................................................................17

ARTICLE IV VOTING AND IMPAIRMENT OF CLASSES..............................................18

    Section 4.01    Impaired Classes of Claims Entitled to Vote.........................................18

    Section 4.02    Classes Deemed to Accept the Plan.......................................................18

    Section 4.03    Classes Deemed to Reject the Plan........................................................18

    Section 4.04    Voting and Confirmation Procedures .....................................................18

    Section 4.05    Confirmation Hearing ............................................................................19

    Section 4.06    Cram Down.............................................................................................19

    Section 4.07    Fair and Equitable Test .........................................................................19

    Section 4.08    Best Interest Test....................................................................................20

ARTICLE V TREATMENT OF CLASSES OF CLAIMS AND INTERESTS ....................21

    Section 5.01    Allowed Professional Fee Claims...........................................................21

    Section 5.02    Allowed Other Administrative Expense Claims......................................22

    Section 5.03    Class 1 Claim:  CLC Secured Claim......................................................22

    Section 5.04    Class 2 Claims: Allowed Priority Claims...............................................22

Section 5.05   Class 3 Claims: Allowed General Unsecured Claims..............................22

Section 5.06   Class 4 Claims:  Intercompany Claims.......................................................23

Section 5.07   Class 5 Claims: Equity Securities. ..............................................................23

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND LEASES......................23

Section 6.01   Executory Contracts Assumed or Deemed Rejected. ...............................23

Section 6.02   Bar Date for Rejection Damages. ...............................................................24

ARTICLE VII MEANS OF IMPLEMENTATION OF THE PLAN...........................................25

Section 7.01   Substantive Consolidation. ........................................................................25

Section 7.02   Retention of Equity....................................................................................26

Section 7.03   Vesting of Assets. ......................................................................................26

Section 7.04   Retention of Causes of Action. ..................................................................26

Section 7.05   Funding. .....................................................................................................26

Section 7.06   Management.................................................................................................26

Section 7.07   Continued Corporate Existence Between the Confirmation Date
and the Effective Date.................................................................................27

Section 7.08   Objections to Claims...................................................................................27

Section 7.09   No Distribution on Disputed Claims...........................................................27

Section 7.10   Section 1146 Exemption. ............................................................................27

Section 7.11   Documentation Necessary to Release Liens. .............................................27

Section 7.12   Appropriate Remedies. ...............................................................................27

Section 7.13   Disbursing Agent and Distribution Record Date. ......................................28

Section 7.14   Avoidance Actions......................................................................................28

Section 7.15   The Litigation Trust. ...................................................................................28

Section 7.16   Creditor Trustee/Post-Confirmation Management .....................................28

ARTICLE VIII BAR DATES FOR ADMINISTRATIVE CLAIMS............................................29

Section 8.01   Bar Date for Administrative Claims. ..........................................................29

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE......................29

Section 9.01   Conditions to Confirmation. .......................................................................29

Section 9.02   Conditions to Effective Date.......................................................................29

ARTICLE X EFFECTS OF CONFIRMATION ........................................................30

    Section 10.01  Debtors' Discharge. ...............................................................30

    Section 10.02  Injunction. .............................................................................30

    Section 10.03  Term of Bankruptcy Injunction or Stays. ...............................31

    Section 10.04  Exculpation. ..........................................................................31

    Section 10.05  Other Documents and Actions. ...............................................31

ARTICLE XI MISCELLANEOUS PROVISIONS..............................................31

    Section 11.01  Headings for Convenience Only. ............................................31

    Section 11.02  Binding Effect of Plan. ..........................................................31

    Section 11.03  Modification of the Plan. ........................................................32

    Section 11.04  Final Order...........................................................................32

    Section 11.05  Severability. ..........................................................................32

    Section 11.06  Governing Law. .....................................................................32

    Section 11.07  Notices. .................................................................................33

    Section 11.08  Filing of Additional Documents. ............................................34

    Section 11.09  Lapsed Distributions. .............................................................34

    Section 11.10  Undeliverable and Unclaimed Distributions............................34

    Section 11.11  Defenses with Respect to Claims............................................34

    Section 11.12  No Injunctive Relief..............................................................34

    Section 11.13  No Admissions.......................................................................34

    Section 11.14  Written Agreement.................................................................34

    Section 11.15  Minimal Distribution. ............................................................35

ARTICLE XII RETENTION OF JURISDICTION ...................................................35

    Section 12.01  Exclusive Jurisdiction of Bankruptcy Court. ............................35

**PLAN EXHIBITS INCLUDED IN PLAN SUPPLEMENT**

Exhibit 1            Liquidation Analysis

Exhibit 2            Disposable Income Projections

Exhibit 3            Schedule of Assumed Contracts

Exhibit 4            Schedule of Rejected Contracts

Exhibit 5            TNS Executory Contract

# ARTICLE I

## INTRODUCTION, DISCLOSURES, DEFINITIONS, INTERPRETATION AND EXHIBITS

### Section 1.01    Introduction

The Debtors propose this First Amended Subchapter V Plan of Reorganization dated February 24, 2023, under sections 1129 and 1191 of chapter 11 of the Bankruptcy Code. The Debtors project that they will have $613,191 in disposable income (the "**Projected Disposable Income**") from operations earned over a three-year period following confirmation of this Plan. Pursuant to the Plan, the Debtors will substantively consolidate their businesses and make three annual installment payments to creditors, as described more fully herein in the amount of the Projected Disposable Income. Additionally, the Debtors will investigate whether they have any claims against former equity holders for recovery of distributions made to such equity holders and, if the Debtors do have valuable and valid claims, the Debtors will place such claims into a trust for the benefit of creditors under this Plan.

The Debtors estimate that this will result in an approximate 12.9% payment of general unsecured claims from Projected Disposable Income, plus potential additional recovery from claims, if any, against former equity holders and related parties.

The Debtors believe that confirmation of the Plan is in the best interest of all parties, including the Debtors' Creditors and Estates. Accordingly, the Debtors urge each Creditor that is Impaired hereunder, and entitled to vote, to vote to accept the Plan.

### Section 1.02    Disclosures

The Debtors submit this Subchapter V Plan of Reorganization and assert that it contains adequate information pursuant to sections 1125(f) and 1187(c).

To be counted, a ballot containing your vote to accept or to reject the Plan must be received by the Clerk of the Bankruptcy Court by no later than 5:00 p.m. Central Standard Time on March 27, 2023.

**NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS PLAN. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECUREYOUR ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN THIS PLAN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT. HOWEVER, THE DATA IN THE DEBTORS' POSSESSION IS BASED ON THE RECORDS OF THE DEBTORS. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN TAKEN TO MAKE SURE IT FAIRLY REPRESENTS THE CURRENT POSITION OF THE**

**DEBTORS. CREDITORS ARE URGED TO CONSULT WITH THEIR OWN INDIVIDUAL COUNSEL OR EACH OTHER AND TO REVIEW ALL OF THE RECORDS HEREIN IN ORDER TO FULLY UNDERSTAND THE DISCLOSURES MADE IN THIS PLAN. ANY PLAN WILL BE COMPLEX, ESPECIALLY SINCE IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT, AND ANY INTELLIGENT JUDGMENT CONCERNING EACH CREDITOR IS URGED TO STUDY THE PLAN IN FULL AND TO CONSULT ITS COUNSEL WITH RESPECT TO THE PLAN, ITS TAX IMPLICATION(S) AND ITS EFFECT ON HIS, HER OR ITS RIGHTS.**

Section 1.03    Background of Subchapter V Case.

The Debtors operate a wireless telecommunications business providing wireless voice, data, and messaging services to customers in a single Rural Service Area ("**RSA**")[2] in north central Illinois, southwest of Chicago. Prior to October 27, 2022, the Debtors were owned by MTCO, Inc. ("**MTCO**"), which is based in Metamora, Illinois. MTCO is a third-generation family-owned local telephone company that provides telephone and internet services to homes and businesses in north central Illinois. The Debtors operate under the trade name "Illinois Valley Cellular." Illinois Valley Cellular was formed in 1989 following the FCC's award of one cellular telephone license to each wireline telephone company approximately corresponding to the specific geographic area it serves.

As of October 28, 2022, the Debtors operated 54 leased cell sites, maintained 8 leased retail stores, and provided service to approximately 14,000 retail wireless customers. The Debtors do not have any direct employees but have a contract with a subsidiary of MTCO for use of 28 full-time employees who work in the Debtors' business.

On October 27, 2022, the Debtors were acquired by IVC Acquisition. The owners of IVC Acquisition are experienced wireless telecommunications operators with 25 years of experience operating rural wireless telecommunications businesses, acquiring and integrating distressed operations, and operating successfully in the same challenging industry environment as the Debtors.

***Challenges Leading to the Bankruptcy Filing***

Prior to the Petition Date, the Debtors' business faced numerous challenges and risks related to the actions and inactions of previous management. Some of these challenges include: inadequate internal controls, poor network quality and customer experience, weak operational execution, high employee defection which led to vacancies in key operational roles, very strained vendor relations (the Debtors had not paid key vendors for nine months prior to the bankruptcy filing), high off-network roaming costs, unfavorable and high-cost long-term contracts, and poor financial decision making. For fiscal year 2021, the Debtors generated approximately $12 million in total revenue and had an operating loss of approximately $2.0 million. For fiscal year 2022, the Debtors estimate a total revenue of $10 million in revenue with an operating loss of

---

[2] Cellular Market Area 398 – Ill-2 Bureau.

approximately $3 million.  Declining revenue and increasing losses led to financial distress and the Debtors' inability to meet their obligations.  Below is a chart of the company's historic and projected cash flow:



The retail wireless industry has evolved rapidly and dramatically since its inception approximately 30 years ago. Early on, the business environment was very favorable for small operators because it was a highly fragmented industry in which operators benefitted from strong product appeal and little competition (only two licensees / one competitor for each geographic licensed area).  A broad eco-system of vendors developed to support rapidly growing small operations, and a high margin revenue stream from the roaming traffic provided by larger carriers operating in neighboring metropolitan areas led to abundant cash flow and profitability. However, the industry quickly evolved as product acceptance and utility became ubiquitous. The FCC auctioned additional spectrum which led to additional competition. The need for nation-wide service, the opportunity for economies of scale, and the capital requirements to support rapid technology evolution, drove industry consolidation and the formation of a few large national operators, e.g., Verizon, AT&T, and Sprint T-Mobile. As industry consolidation accelerated, the business environment for small rural carriers became more difficult and most rural operators exited the business, typically through a sale of the business to a larger regional or national carrier.

Today there are few small regional / rural operators, and the industry circumstances are very challenging. Some of the most significant challenges facing small wireless operators include:

- complex technology evolution and lack of specialized / skilled technology employees to operate and maintain these complex networks;

- lack of scale in purchasing, which results in higher costs than national carriers;

- increasingly complex consumer devices, which require more highly skilled employees and technology systems for activation, programming, customer education, and trouble-shooting;

- lack of reasonable commercial terms for, support of, and availability of devices from large suppliers like Apple, Motorola, and Samsung;

- a smaller and less sophisticated eco-system of vendors to provide critical services such as billing, network support, device inventory logistics, network monitoring, etc.; and

- lack of reliable network infrastructure providers willing to support smaller networks (large infrastructure vendors like Nokia and Ericsson do not effectively support smaller operators).

In the face of difficult competitive and industry conditions, the previous owners of the Debtors made several poor decisions that led to the deeply distressed circumstances of the current business including the following:

1) Terminating Its Partnership with Verizon. - Rather than selling the business to Verizon when offered (and focusing on its less competitive wireline telephone business), MTCO ownership terminated its partnership with Verizon. Because of the proximity of this market to Chicago and the multiple interstate highways served, Verizon used other radio spectrum it acquired in FCC license auctions (PCS, AWS and 700MHz) and initiated a network build-out to cover the Debtors' service area, becoming a direct competitor of the Debtors. This was not only a seismic shift in the competitive landscape in the market, but it also resulted in the loss of inbound roaming traffic and revenue to the Debtors, which offset the cost of the Debtors' customers roaming on Verizon's network and compromised most of the Debtors' operating profit.

The loss of Verizon roaming revenue was monumental to the Debtors because they relied on Verizon to provide service to their customers outside of their eight-county licensed home service area. Because Verizon no longer relied on the Debtors to serve its customers, Verizon had no incentive to offer low-cost access to the Verizon network to the Debtors.

In addition to the loss of inbound roaming revenue and the high cost of outbound roaming for IVC's customers, Verizon became a direct competitor, which led to a steady decline in the Debtors' customer base. The decline in roaming and customer revenue combined with a mostly fixed cost structure, resulted in operating losses. The previous owners should have foreseen this outcome but did not.  Additionally, as this dynamic began seriously impacting IVC's operating profitability and business in general, the previous owners neglected to modify IVC's cost structure to address its declining revenue and customer base, which led to deterioration in its financial condition.

2) Failure to Adapt to Competitive Realities.  After Verizon overbuilt IVC, T-Mobile and Sprint both completed overbuilds of the key highways and population centers in IVC's

4

territory and opened retail locations. Additionally, in recent years, sub-brands (Cricket and MetroPCS) and Mobile Virtual Network Operators (Straight Talk Wireless, Tracfone, Consumer Cellular, and others) have expanded the competitive landscape and caused additional subscriber losses and accelerated the decrease in revenue.

In the face of this increasing competition and its obvious effects on IVC's customer base, customer revenue, and profitability, IVC's previous owners failed to modify the business' expense structure. The effect of declining revenue with stable or increasing expenses led to growing losses.

3) <u>Reduced and Ineffective Capital Investment</u>. As the industry moved from 3G to 4G LTE and Voice over LTE (VoLTE), IVC did not. The result was IVC falling further behind its competitors. AT&T, Verizon, T-Mobile and Sprint upgraded their networks and thus were able to offer their customers better quality service, including higher data speeds. The result was further decline in the customer base, customer revenue, and profitability.

4) <u>Sale-Leaseback of Communications Towers</u>. As financial pressure on IVC mounted, the previous owners determined to raise capital by selling the Debtors' 50 owned communications towers. The Debtors received $10 million in proceeds from the sale but agreed to lease back space on the towers with a 10-year non-cancellable term that added approximately $1.3 million in annual lease expense to IVC's already negative operating profitability and negative cash flow.

It appears that the previous owners used the proceeds from the tower sale to fund operating losses, to fund over $3 million in redemptions of equity interests, and to fund a portion of the cost to upgrade the Debtors' network to 4G LTE. Within three years, all the proceeds from the tower sale had been burned through and, with growing operating losses, the Debtors had no ability to pay operating expenses to maintain their business operations nor to complete the network upgrade to 4G LTE or VoLTE.

In early 2022, the Debtors stopped paying vendors and stopped purchasing inventory for their retail stores. Additionally, the Debtors did not replace their customers' 3G-only devices, even though they knew those devices would stop working off-network at the end of 2022.

5) <u>High Risk Vendor Selection</u>. IVC's previous owners did not select an experienced network infrastructure vendor to support its upgrade to 4G LTE or VoLTE. It had used Ericsson (for 3G and for cell site equipment), but, presumably for cost reasons, selected a core vendor that was not established or experienced in mobile wireless communications segment, Casa Systems. After over two years of work on the network upgrade, IVC's previous owners were not able to complete the upgrade prior to selling the business to IVC Acquisition and the filing of IVC's bankruptcy. The significant delays in upgrading the network and the customer impact of problems experienced during the upgrade has led to substantial customer losses, further revenue contraction and growing operating losses.

6) <u>Failure to Retain Key Personnel</u>. Over the past two years, the Debtors have lost key personnel, primarily because the downward trajectory of the business created concerns by

employees and a lack of faith in ownership that were not properly or adequately addressed. The key positions that were vacated and not replaced include: General Manager, Chief Technology Officer, Switch Manager, Cell Site Technicians, Accounting Manager, Director of Marketing, Director of Billing and IT, several staff accountants, and numerous front-line retail and customer care positions. The result was that IVC has not had sufficient staffing to implement the technology upgrade or to execute basic operating functions necessary to sustain a heathy business.

7) <u>Failure to Address High Fixed Costs</u>. IVC's previous owners failed to address the growing challenges in IVC's business by taking the difficult steps to reduce fixed expense related to retail distribution, fixed network costs, and high-cost vendor contracts as revenues declined.

8) <u>Weak Operational Controls</u>.  As the financial condition of the business deteriorated and key personnel left, IVC's previous owners neglected fundamental operating processes and oversight and basic expense controls were ignored. Invoices were not scrutinized and opportunities to improve costs were overlooked. The result was an accelerating decline in the financial condition of the business.

### *Sale of Debtors Prior to the Bankruptcy Filing*

On October 27, 2022, IVC Acquisition purchased 100% of the membership interests in the Debtors, which were insolvent at the time of the acquisition.

IVC Acquisition is owned by CLC.  CLC is 85% owned by Anacoco Capital Partners, LLC, and 15% owned in aggregate by five investors.  Anacoco Capital Partners, LLC, is owned 50% by Jonathan Foxman, the Chief Executive Officer of IVC Acquisition and 50% by Daniel Hopkins, the Chief Financial Officer of IVC Acquisition.  CLC operates a wireless business that is similar to the Debtors' business.  As such, in addition to CLC's management expertise and technical knowledge, CLC offers significant operating efficiencies to help improve the Debtors' financial performance.  It is clear that if IVC Acquisition had not acquired the Debtors, the Debtors would not have survived much longer.

IVC Acquisition made the purchase with the intent to restructure the Debtors, including making certain capital investments in the Debtors through a chapter 11 restructuring process. Contemporaneous with the purchase of the Debtors, CLC made the CLC Loan to the entities in the amount of $770,390.54, which was used to pay off the Debtors' senior secured bank debt. The CLC Loan is secured by substantially all the Debtor's assets.

On October 28, 2022, the day after IVC Acquisition purchased the Debtors, the Debtors filed the Bankruptcy Cases.  The Debtors have been operating their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Robert P. Handler was appointed as Subchapter V Trustee.  On November 10, 2022, the Court entered an order directing joint administration of the Debtors' bankruptcy cases.

### *Significant Events in the Bankruptcy Case*

6

On or about the Petition Date, Robert P. Handler was appointed as Subchapter V Trustee. On November 2, 2022, the Debtors filed a motion for joint administration of their bankruptcy cases, a motion to maintain prepetition bank accounts and continue use of existing business forms, and a motion to authorize the Debtors to assume certain intercarrier roamer servicer agreements (the "**First Day Motions**"). The Court granted all of the First Day Motions by orders entered on November 10 and 11, 2022.

On November 7, 2022, the Debtors filed a motion to sell its Metaswitch IMS Core assets to its parent company CLC for consideration valued at over $1.4 million, including $550,000 in cash and/or credits, use of the equipment without charge and reduction of maintenance expenses related to the assets. The Court granted the motion on November 30, 2022.

On November 21, 2022, the Debtors filed their schedules and statement of financial affairs and filed amended schedules on January 6, 2023. On November 29, 2022, the United States Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code. On November 23, 2022, the Debtors filed an application to retain Shelly A. DeRousse and the law firm Freeborn & Peters LLP. The Court granted the application on November 30, 2022.

On December 28, 2022, the Debtors filed motions to assume executory contracts of Interop Technologies, LLC and Software Consultants, Inc. (the "**Assumption Motions**") and a motion to obtain unsecured credit from a related entity CLC (the "**Financing Motion**") to fund the cure costs of the contract assumptions. On January 17, 2023, the Court granted the Assumption Motions and the Financing Motion.

On January 12, 2023, the Debtor filed a motion to provide adequate assurance to their utility providers (the "**Utilities Motion**"). On January 19, 2023, the Debtors filed a motion for compromise to terminate possession of one of their retail locations (the "**9019 Motion**"). The Utilities Motion, the 9019 Motion and the Tower Rejection Motion are all pending as of the filing of this Plan.

On January 25, 2023, the Debtor filed a motion to reject a series of agreements, including certain non-residential real property subleases, with American Tower Corporation and its affiliates by way of assignment from the City of Peru, Illinois for the Debtors' use of a communications tower facility and associated raw land (the "**American Tower Rejection Motion**"). On January 25, 2023, the Debtors also filed a motion to reject a lease with the City of Peru, pursuant to which the Debtors leased space on a water tower and associated ground space for the placement of certain communication equipment (the "**City of Peru Rejection Motion**"). On January 31, 2023, the Debtors filed a motion to reject fifty (50) site leases for communications towers (the "**Vertical Bridge Rejection Motion**") owned by Vertical Bridge Towers III, LLC ("**Vertical Bridge**"), which no longer provide meaningful value to the Debtors' business. On February 22, 2023, the Court entered orders granting the American Tower Rejection Motion and the City of Peru Rejection Motion. The Vertical Bridge Rejection Motion is pending as of the filing of this Plan.

On February 3, 2023, the Debtors filed a motion to assume executory contracts of Casa Systems, Inc. and to purchase certain equipment from Casa Systems, Inc., which was granted by Court order entered on February 22, 2023.

***Post-Petition Restructuring Efforts***

Since the Petition Date, the Debtors have been engaged in improving the operations of the business, including negotiations with their vendors which provide products and services that are necessary and critical to the Debtors' ongoing operations and have reached an agreement with three significant vendors to assume the vendors' agreements with the Debtors, with generally more favorable terms than the contractual terms, and to modify such agreements to reduce the ongoing expenses to the Debtors and improve the Debtors' cash flow. However, these assumptions will require a substantial cash outlay by the Debtors to pay the costs to cure outstanding monetary defaults, even at reduced rates.

Since the Petition Date, the Debtors have undertaken aggressive efforts to improve the financial and operational condition of their business. Below are the principal accomplishments.

1) <u>Repaid Senior Secured Bank Loan</u>. Upon acquiring the Debtors, IVC Acquisition repaid IVC's $770,390.54 senior secured loan from Ottawa Bank. By doing so and by replacing the facility on terms more favorable[3] to the Debtors, IVC Acquisition has improved the standing of the Debtors' unsecured creditors and increased the probability of repayment of pre-petition claims.

2) <u>Resurrected Critical Vendor Relationships</u>. Based on CLC's longstanding relationships with the Debtors' most important vendors, despite IVC not paying many of them for as long as nine months, CLC was able to reestablish goodwill and trust, which facilitated a productive renegotiation of contract terms. This included reducing pricing during the bankruptcy period and resetting the contracts going forward. Most of these represent very significant savings to the Debtors.

3) <u>Implemented New Roaming Terms</u>. CLC was able to leverage its strong historic relationship with AT&T to establish a new roaming agreement that reduced IVC's roaming rates by approximately 85%. Moreover, CLC was able to obtain AT&T's cooperation to complete the technical steps necessary to implement VoLTE roaming on an expedited basis both to reduce cost and to improve the quality of service to customers.

4) <u>Launched Network Upgrade to VoLTE</u>. With direction and assistance from CLC, IVC was able to successfully launch its VoLTE network upgrade, meeting an extremely short deadline before Verizon shut down its 3G network on January 3, 2023. This project involved numerous technical and operational aspects, including billing system

---

[3] At the time of IVC Acquisition's purchase of the Debtors, the secured loan from Ottawa Bank was in default, because the Debtors' income was insufficient to service the Debt. The replacement loan from CLC is more favorable to the Debtors because it does not require a principal payment for two years, materially improving the Debtors' cash flow and ability to pay trade debt.

reconfiguration and integration; configuration and testing with roaming partners; and configuration, testing, and launch of major core network components. Without completing this upgrade before Verizon's shutdown, all of IVC's customers would have lost the ability to make or receive calls outside IVC's eight county home service area. The likely result of which would have been mass customer loss and the failure of the business. This accomplishment was especially significant, not just because it was critical to retaining IVC's customers, but also because six to eight months of work had to be accomplished in 60 days, since IVC's previous owners had effectively given up on the project and not undertaken many of the necessary activities related to it.

5) <u>Upgraded Customer Devices</u>. Approximately 4,000 IVC customers, roughly 30% of the customer base, did not have devices that were VoLTE-capable, meaning they would not function outside IVC's eight county home service area. With direction and assistance from CLC, IVC has been working aggressively to update or replace these devices. A significant complication in this effort has been that device manufacturers like Apple, Samsung, and others typically would require IVC's network-specific settings as much as six to nine months in advance of any new device or device software release. However, IVC's previous owners did not provide them its settings and, as a result neither (a) new VoLTE-capable devices that were and for some time would be available from device manufacturers nor (b) VoLTE-capable devices that some IVC customers already owned by required software updates to activate VoLTE would function on IVC's newly launched VoLTE network.

CLC was able to persuade Samsung to create a special software load to include IVC's network settings sooner than Samsung's published software version release schedule. Similarly, CLC was able to identify and engage additional device vendors to help supply working versions sooner. While this effort is still underway, significantly more IVC customers have fully functional VoLTE devices today than was likely to be the case.

6) <u>Retail Store Relocations</u>. IVC has undertaken an effort to relocate its retail stores to reduce expenses. IVC's Streator location has been moved, saving the company approximately $5,000 per month. The Peru location has been moved, saving the company $6,000 per month. The Ottawa location is in the process of being moved, whereby the new lease will save the company $3,000 per month. Additional relocations are planned as well and total targeted savings are expected to be approximately $21,000 per month or $250,000 per year.

7) <u>Expense Management Initiatives</u>. With direction and assistance from CLC, IVC has undertaken invoice reviews and identified charges for discontinued services, pricing for services that had escalated and were much higher than market pricing, and charges for services that are no longer necessary. These include long distance service, network connections, retail store internet and trash services, etc., and represent savings of over $20,000 per month. The total annual expense savings is expected to exceed $6 million, and the following chart provides a summary of the most significant categories:

| Network Operating Expenses | Pre-Petition | Per Month Projected | Reduction | % Reduction | Annualized Reduction |
|---|---|---|---|---|---|
| Off-Network Roaming Expense | $190,000 | $75,000 | ($115,000) | -61% | ($1,380,000) |
| Roaming Clearing | $62,000 | $25,000 | ($37,000) | -60% | ($444,000) |
| SMS, IVR, OTA, Other | $72,500 | $30,000 | ($42,500) | -59% | ($510,000) |
| Network Policy Manager | $9,300 | $3,500 | ($5,800) | -62% | ($69,600) |
| Core and Ran Network Support | $20,322 | $3,833 | ($16,489) | -81% | ($197,862) |
| Long Distance | $27,000 | $3,375 | ($23,625) | -88% | ($283,500) |
| Total Network Expenses | $191,122 | $140,708 | ($125,414) | -66% | ($2,884,962) |
| | | | | | |
| Cell Site Expenses | Pre-Petition | Projected | Reduction | % Reduction | Annualized Reduction |
| Number Operating Sites | 54 | 18 | (36) | -67% | (36) |
| Tower Rent Expense | $112,089 | $9,760 | ($102,329) | -91% | ($1,227,943) |
| Utilities | $20,308 | $6,769 | ($13,538) | -67% | ($162,461) |
| Backhaul | $51,585 | $23,862 | ($27,723) | -54% | ($332,682) |
| Site Maintenance | $39,410 | $9,000 | ($30,410) | -77% | ($364,920) |
| E911/CALEA | $16,161 | $5,387 | ($10,774) | -67% | ($129,287) |
| Total Cell Site Expenses | $239,553 | $54,778 | ($184,775) | -77% | ($2,217,294) |
| | | | | | |
| Retail, General & Admin Expense | Pre-Petition | Projected | Reduction | % Reduction | Annualized Reduction |
| Retail Store Expenses | $28,000 | $7,000 | ($21,000) | -75% | ($252,000) |
| Commsoft Billing System | $12,800 | $5,000 | ($7,800) | -61% | ($93,600) |
| Staffing | $152,613 | $120,274 | ($32,339) | -21% | ($388,067) |
| Facilities Rent | $34,432 | $8,358 | ($26,074) | -76% | ($312,887) |
| | $227,845 | $140,632 | ($87,213) | -38% | ($1,046,553) |

8) <u>Long Range Projections</u>.  With direction and assistance from CLC, IVC has completed a long-range business plan that considers current industry conditions, competitive dynamics, and the numerous business initiatives that have been accomplished or are planned. Because of the technology conversion, the Verizon 3G network shutdown, and the associated customer device impact, we project a meaningful decline in customers that are adversely impacted by those activities. Additionally, our revenue projections reflect certain planned changes to the FCC's Wireless Universal Service Funding program which is being phased out over the next three years. Offsetting the declining revenue trends are very significant expense reductions of over $6 million a year which allows us to return the Debtors to sustained operating profitability. Below is a chart that summarizes the dramatic improvement to operating profitability (from approximately $3 million in annual losses to consistent profitability) because of the improvements to the business operations.



CLC has supported the Debtors with significant investments of time and expertise by its personnel in nearly every functional area of the business, including engineering, accounting, logistics, billing, roaming, and IT. CLC staff, from senior executives to engineering specialists, work closely in support of and to supplement IVC staff on a daily basis. All of this is done without compensation, which materially benefits IVC and its Creditors.

### *The Debtors' Post-Confirmation Restructuring*

Because of the industry's continued rapid pace of technology evolution, the advantages conferred to IVC's national carrier competitors by their enormous scale, the Debtors do not believe that a small carrier like IVC can achieve a sustainable competitive network advantage without partnering with national operators and leveraging both local and nationwide networks. IVC's long-term plan reflects a move away from an entirely facilities-based network operation in the home market to an increased reliance on national carriers even locally to deliver the best quality network experience for customers, optimizing network operating expenses and capital expenditures with meeting customer needs. Through this strategy, IVC plans to emphasize customer retention, stabilize revenue, and maximize profitability.

By materially reducing the network component of the business operation, the Debtors expect to reduce both the business risk and the fixed expense structure while improving the quality of service to customers. The current network operations include a switch / core network as well as 54 leased communications towers, utilities, and fiber backhaul connectivity expense. The current monthly expense to operate the network is $112,000 in tower rent, $40,000 a month for site maintenance, $20,000 in electric utility cost, and $52,000 in fiber backhaul costs for a total of $224,000 per month. These expenses are mostly fixed contracts with multi-year terms and breakage cost for early termination. This structure creates a lack of flexibility to reduce expenses if revenue contracts (as it has over the past five years for IVC).

Following the confirmation of the Plan, the Debtors will continue to substantially reduce network expenses. This will be accomplished by placing their customers' usage on their roaming partners' networks, including AT&T, Verizon, and T-Mobile. The Debtors have filed the Vertical Bridge Rejection Motion to reject their tower leases with Vertical Bridge. After the

Vertical Bridge leases are rejected, the Debtors will rely on a combination of roaming networks and lower-cost replacement sites to support their customers' coverage needs.

Section 1.04   <u>Definitions</u>.

"**Administrative Claim**" means a Claim of a Creditor of the kind specified in section 503(b) of the Bankruptcy Code that is entitled to priority under section 507(a)(2) of the Bankruptcy Code, and includes: (i) actual and necessary costs and expenses incurred by a Debtor after such Debtor's Petition Date with respect to preserving such Debtor's Estate and operating the Debtor's business; (ii) any Professional Fee Claims approved by the Bankruptcy Court under section 330 of the Bankruptcy Code that are incurred on or before the Confirmation Date; and (iii) all fees and charges properly assessed against the Debtors' Estates under 28 U.S.C. § 1930. For the avoidance of doubt, these Claims shall include Other Administrative Expense Claims and Professional Fee Claims.

"**Allowed Claim**" or "**Allowed . . . Claim**" means a Claim, proof of which is filed within the time fixed by the Bankruptcy Court, or that has been, or is hereafter, scheduled by the Debtors as liquidated in amount and not disputed or contingent, and to which no objection to allowance thereof has been raised by the Debtors within the applicable period fixed pursuant to the Plan, or as to which a Final Order allowing such Claim has been entered.

"**Avoidance Action**" means any claim or right under the following: sections 542, 544, 545, 547, 548, 549, 550, 551 and 553(b) of the Bankruptcy Code; all prevailing fraudulent conveyance and fraudulent transfer laws; all non-bankruptcy laws vesting in debtors' or creditors' rights to avoid, rescind, or recover on account of transfers, including, but not limited to, claims relating to illegal dividends; all preference laws; the Uniform Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.*; and any other applicable federal, state, or common law, including fraudulent transfers, whether or not litigation has been commenced with respect to such actions as of the Effective Date.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Illinois, located in Chicago, Illinois, and any other court having jurisdiction over these Cases or a proceeding arising in, or arising under or related to these Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, as now in effect.

"**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" as that term is defined in Bankruptcy Rule 9006(a).

"**Case**" or "**Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, which are jointly administered under Case No. 22-12537, currently pending before the Bankruptcy Court.

"**Cash**" means legal tender of the United States of America and equivalents thereof.

"**Causes of Action**" means all claims and causes of action, including Avoidance Actions, of the Debtors as of the Effective Date, whether arising under any contract, the Bankruptcy Code, or other federal or state law, including, but not limited to, all litigation pending in any jurisdiction in which the Debtors are plaintiffs, defendants or other parties, and all other adversary proceedings and lawsuits, together with all products and proceeds thereof.

"**Claim**" means any right to payment, other than an Administrative Claim, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, as defined by section 101(5) of the Bankruptcy Code.

"**Class**" means a class of Holders of Claims as described in the Plan.

"**CLC**" means Central Louisiana Cellular, LLC.

"**CLC Administrative Claim**" is the Administrative Claim of CLC arising out of the CLC Revolver.

"**CLC Loan**" means the loan from CLC to the Debtors made on or about October 27, 2022 in the original principal amount of $770,390.54, pursuant to the terms of note and security agreement from the Debtors in favor of CLC.

"**CLC Revolver**" means the revolving line of credit from CLC to the Debtors in the amount of $650,000.00 which was approved by the Bankruptcy Court in these cases.

"**CLC Secured Claim**" is the Secured Claim of CLC in substantially all of the assets of the Debtor, securing the CLC Loan.

"**Confirmation Date**" means the date of entry of the Confirmation Order.

"**Confirmation Hearing**" means the hearing of the Bankruptcy Court on the confirmation of the Plan.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

"**Creditors**" means all Persons holding Claims against the Debtors.

"**Debtors**" means RSA 2-I and RSA 2-II as debtors and debtors-in-possession in the Cases.

"**Disbursing Agent**" means RSA 2-I, with respect to the assets being disbursed under this Plan; provided that if a Litigation Trust is created to pursue Trust Causes of Action, the Trustee of the Litigation Trust shall be the Disbursing Agent with respect to any assets in the Litigation Trust.

"**Disputed Claim**" means any Claim that is not an Allowed Claim or a claim the Debtors agree should be allowed.

"**Effective Date**" means the later of (i) the date on which all of the conditions to the effectiveness of the Plan as specified in Section 9.02 of the Plan have been satisfied or waived in accordance therewith or (ii) two (2) business days after the Confirmation Order is no longer appealable under the Federal Rules of Bankruptcy Procedure or the local rules for the Bankruptcy Court for the Northern District of Illinois.

"**Equity Security**" has the meaning as defined in section 101(16) of the Bankruptcy Code.

"**Estates**" means the estates of the Debtors created in these Cases under section 541 of the Bankruptcy Code.

"**Executory Contract**" means a contract or lease to which the Debtors are a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"**FCC**" means the United States Federal Communications Commission.

"**Final Order**" means an order or judgment as to which the time to appeal or seek direct review or rehearing has expired and as to which no timely appeal or petition for review or rehearing is pending.

"**General Unsecured Claim**" means any Unsecured Claim, arising prior to the Petition Date, as applicable to each Debtor, that is not a Professional Fee Claim, Other Administrative Expense Claim, Class 1, Class 2, Class 4 Claim, or Class 5 Equity Securities.

"**Holder**" means an entity, Person, or governmental unit that owns a Claim or Interest.

"**Impaired**" means any Class, or any Claim or Equity Security in a Class, which is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Insider**" has the meaning provided by section 101(31) of the Bankruptcy Code.

"**Intercompany Claim**" means any Unsecured Claim held by any Debtor against another Debtor.

"**Interest**" means a right of the owners or Holders of any equity interests of the Debtors, including, but not limited to, the Equity Security Holders of the Debtors.

"**IVC**" means the Debtors.

"**IVC Acquisition**" means IVC Acquisition, LLC.

"**Lapsed Distribution**" means any distribution which has not been cleared or deducted from the Debtors' bank account within ninety (90) days of the date of the distribution.

"**Lien**" has the meaning provided by section 101(37) of the Bankruptcy Code.

"**Litigation Trust**" means a trust for the benefit of Creditors and Interest Holders that may come into existence in accordance with Section 7.04 of this Plan.

"**Net Trust Cash**" means the Cash in the Litigation Trust, including but not limited to proceeds of liquidating the Trust Causes of Action, after the fees, costs, and expenses of the Litigation Trust have been paid.

"**Other Administrative Expense Claim**" means an Administrative Claim that is not a Professional Fee Claim.

"**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity.

"**Petition Date**" means October 28, 2022, which is the date that the Debtor filed petitions under Chapter 11 of the Bankruptcy Code.

"**Plan**" means the Debtors' First Amended Subchapter V Plan of Reorganization dated February 24, 2023, together with all exhibits, schedules, and annexes hereto, all as may be modified, supplemented, or amended from time to time.

"**Plan Supplement**" means the supplemental annex to the Plan, if any, consisting of a compilation of documents and forms of documents, schedules and exhibits to be filed with the Plan or on or before the Plan Supplement Filing Date.

"**Plan Supplement Filing Date**" means the date that is fourteen (14) days prior to the deadline set by the Bankruptcy Court to submit ballots to vote on the Plan.

"**Post-Effective Date Debtors**" means the Debtors in their post-Effective Date status.

"**Priority Claim**" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Pro Rata**" means proportionately so that the ratio of the amount of the distribution made on account of a particular Allowed Claim to the distribution made on account of all Allowed Claims of the Class in which the particular Allowed Claim is included is the same as the ratio of the amount a particular Allowed Claim to the total amount of the Allowed Claims of the Class of which a particular Allowed Claim is included.

"**Professional Fee Claim**" means a Claim of a Professional Person for compensation for services rendered in this Case prior to the Confirmation Date under sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code, for such Professional Person.

"**Professional**" or "**Professional Persons**" means Persons, including attorneys, accountants and financial advisors retained by the Debtors, or to be compensated under sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code.

"**RSA 2-I**" means Illinois Valley Cellular RSA 2-I, LLC.

"**RSA 2-II**" means Illinois Valley Cellular RSA 2-II, LLC.

"**Schedules of Assets and Liabilities**" means the Schedules of Assets and Liabilities and Statements of Financial Affairs filed by the Debtors in the Cases and any amendments thereto.

"**Secured Claim**" means for each Estate, a Claim secured by a lien on property of the Estate, or a Claim subject to set off under section 553 of the Bankruptcy Code, to the extent of the value of such Creditor's Lien or security interest in property of the Estate, or to the extent of the amount subject to set off, as the case may be, which is either agreed to by the Debtors pursuant to this Plan or, in the absence of agreement, has been determined or is determined in accordance with Sections 506(a) and 502(b).

"**Subchapter V Trustee**" shall mean Robert P. Handler or any such person appointed by the U.S. Trustee to serve as subchapter V trustee in these cases.

"**Substantive Consolidation Order**" means the order, or provision in the Confirmation Order, substantively consolidating the Chapter 11 Cases as provided in Section 7.01 of the Plan.

"**Trust Assets**" means $50,000.00 paid by the Post-Effective Date Debtors within sixty (60) days after a Litigation Trust is created, the Trust Causes of Action, and the Net Trust Cash or other proceeds from the Trust Causes of Action.

"**Trust Causes of Action**" means claims against the Debtors' former equity holders or insiders, and claims related to or arising from transfers made to the Debtors' former equity holders prior to the Petition, which the Post-Effective Date Debtors determine are viable and valuable and transfer into the Litigation Trust.

"**Trustee**" means the trustee of the Litigation Trust.

"**Unsecured Claim**" means a Claim not secured by a Lien on property of the Estates, not entitled to be classified as a Priority Claim under section 507 of the Bankruptcy Code, and excludes the Insider Subordinated Claims and Intercompany Claims.

"**U.S. Trustee**" means the United States Trustee.

Section 1.05   <u>Rules of Interpretation and Computation of Time</u>.

For purposes of the Plan, unless otherwise provided herein:  (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (ii) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (iv) any reference to any entity as a holder of a Claim or Equity Security includes the entity's successors and assigns; (v) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (vi) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vii) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a

part of or to affect the interpretation of the Plan; (viii) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (ix) in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

Section 1.06    Exhibits.

All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein, regardless of when filed.  All references to "the Plan" shall be construed, where applicable, to include references to this document and all of its exhibits, appendices, schedules and annexes (and any amendments thereto made in accordance with the Bankruptcy Code).  To the extent that the description of any exhibit, appendix, schedule or annex to the Plan is inconsistent with the actual terms or conditions of such exhibit, appendix, schedule or annex, the terms and conditions of the exhibit, appendix, schedule or annex, shall control.

**ARTICLE II**

**UNCLASSIFIED CLAIMS**

Section 2.01    Unclassified Claims.

In accordance with sections 1123(a)(1) and 1129(a)(9) of the Bankruptcy Code, Administrative Claims are not classified and are excluded from the Classes designated in Article III of the Plan.  Administrative Claims shall include Professional Fee Claims and Other Administrative Claims. The treatment accorded unclassified Claims is set forth in Article V of the Plan.  The holders of such Claims are not entitled to vote on the Plan.

**ARTICLE III**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

Section 3.01    Classified Claims.

Under section 1123(a)(1) of the Bankruptcy Code, Claims and Equity Securities are classified as follows:

(a)    Class 1 consists of the CLC Secured Claim against the Debtors.

(b)    Class 2 consists of the Allowed Priority Claims against the Debtors.

(c)    Class 3 consists of the Allowed General Unsecured Claims against the Debtors.

(d)    Class 4 consists of Intercompany Claims.

(e)    Class 5 consists of the Equity Securities.

17

# ARTICLE IV

# VOTING AND IMPAIRMENT OF CLASSES

Section 4.01    <u>Impaired Classes of Claims Entitled to Vote</u>.

Under the Bankruptcy Code, only classes of claims and interests that are impaired under the plan are entitled to vote to accept or reject a plan. A class is impaired if the legal, equitable or contractual rights to which the holders of claims or interests are entitled are modified, other than by curing defaults and reinstating the debt. Pursuant to sections 1126(f) and (g) of the Bankruptcy Code, classes of claims and interests that are not impaired are conclusively presumed to have accepted the plan and are not entitled to vote on a plan, and classes of claims and interests whose holders will receive or retain no property under the plan are deemed to have rejected a plan and are not entitled to vote on a plan. Creditors who hold disputed or disallowed claims are not entitled to vote to accept or reject the plan.

Under the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims properly voted in that class, voted to accept.  A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Except as otherwise ordered by the Bankruptcy Court, Class 1, Class 2, Class 3, Class 4, and Class 5 are Impaired, and the holders of Claims in those Classes are entitled to vote to accept or reject the Plan, except to the extent that such Creditor is an Insider.

Section 4.02    <u>Classes Deemed to Accept the Plan</u>.

None of the Classes are unimpaired and deemed to accept the Plan.

Section 4.03    <u>Classes Deemed to Reject the Plan</u>.

The holders of the Class 4 Intercompany Claims will not receive or retain any distribution under the Plan on account of such Claims.  Under section 1126(g) of the Bankruptcy Code, all of the foregoing Classes are Impaired and are conclusively presumed to have rejected the Plan, and the votes of Holders in such Classes therefore will not be solicited.

Section 4.04    <u>Voting and Confirmation Procedures</u>

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Please carefully follow the instructions set forth in the ballot and vote and return your ballot(s), by first class mail, hand or overnight courier, to:

> Clerk of Bankruptcy Court
> Everett McKinley Dirksen United States Courthouse
> 219 South Dearborn Street
> Chicago, Illinois 60604

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M. (CENTRAL TIME) ON March 27, 2023 (THE "*VOTING DEADLINE*").**

**ANY BALLOT WHICH IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED, WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN. ANY BALLOT THAT IS EITHER UNRETURNED BY THE VOTING DEADLINE OR IS RETURNED BUT NOT EXECUTED WILL BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Plan or the procedures for voting on the Plan, please email counsel for the Debtors, Freeborn & Peters LLP, Attention: Shelly A. DeRousse, Esq. at sderousse@freeborn.com.

Section 4.05    Confirmation Hearing

A Confirmation Hearing is scheduled for April 5, 2023 at 10:00 a.m. CST before the Honorable Timothy A. Barnes. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on all required parties on or before the objection deadline that has been set by the Bankruptcy Court. Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

Section 4.06    Cram Down.

The Debtors will request confirmation of the Plan under section 1191(b) of the Bankruptcy Code with respect to each Class that has not accepted the Plan. In the event of a cram down under section 1191(b), the Disbursing Agent shall make payments to Creditors under the Plan and, notwithstanding section 1194(b), the Subchapter V Trustee shall have no duty to make payments to Creditors under the Plan.

Section 4.07    Fair and Equitable Test

To obtain confirmation of a plan over the objection of a class of claims or interests that rejects such plan, it must be demonstrated that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such non-accepting class. In order for a plan to be found to be "fair and equitable" and thus subject to confirmation by "cramdown" under the Bankruptcy Code, the Debtors must demonstrate:

(1) As of the Effective Date:

a.   The plan provides that all of the projected disposable income of the debtor to be received in the three-year period, or such longer period not to exceed five years as the court

19

may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or

b.   The value of the property to be distributed under the plan in the three-year period, or such longer period not to exceed five years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor; and

(2) (A)(i)     the debtor will be able to make all payments under the plan; or

(ii) There is reasonable likelihood that the debtor will be able to make all payments under the plan; and

(B) the plan provides for appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

The Debtors believe that the Plan meets the fair and equitable test, as the Debtors will make distributions under the Plan in excess of their projected disposable income over a three-year period following Plan confirmation.   Additionally, the Plan provides for appropriate remedies in the event of a default in Section 7.11.

The Debtors will also pay administrative claims upon the Effective Date and Debtors will not pay principal payment or interest payments related to their secured debt in the distributions of the Projected Disposable Income. The Debtors' projected disposable income is calculated on **Exhibit 2** to this Plan, and is summarized in the table below.

| Combined Projected Disposable Income | | | | |
|---|---|---|---|---|
| | **2023*** | **2024** | **2025** | **2026** |
| Operating Revenue | $    5,615,812 | $   6,858,723 | $   6,270,887 | $   5,926,635 |
| Operating Expenses | 4,842,883 | 6,013,216 | 5,970,716 | 5,635,210 |
| EBITDA | 772,930 | 845,507 | 300,172 | 291,426 |
| | | | | |
| Capital Investment | (300,000) | (325,000) | (25,000) | (25,000) |
| | | | | |
| Principal Payments Revolver | (162,500) | (216,667) | (216,667) | (54,167) |
| Cash Interest Expense | (26,000) | (23,292) | (10,292) | (78,900) |
| Senior Secured Note Payable | | | | (133,359) |
| | | | | |
| Projected Net Disposable Income | $      284,430 | $      280,548 | $      48,213 | $      0 |

*2023 Projection relates to the 9 month period following the implementation of the plan

Section 4.08    Best Interest Test

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such

holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  The Debtors believe that holders of Impaired Claims and interests in each Impaired Class under the Plan would receive significantly less under a chapter 7 liquidation than under the Plan. This difference is represented in the liquidation analysis (the "**Liquidation Analysis**") attached hereto as **Exhibit 1**.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such debtor's assets in a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the bankruptcy case and priority claims.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as that of counsel and other professionals retained by the trustee, asset disposition expenses and all unpaid expenses incurred until the liquidation is completed.

The Debtors believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of each Impaired Class will receive significantly greater value under the Plan than they would in a chapter 7 liquidation proceeding. The Debtors' Liquidation Analysis demonstrate that in the event of liquidation as described therein, holders of Unsecured Claims would not receive a distribution on their Claims, barring recovery from Litigation Trust Claims, if any. To the extent that the Debtors determine that there are valuable Litigation Trust Claims, they will be passed directly on to the Creditors by way of a Litigation Trust, so they will receive the same or better value of the Litigation Trust Claims than they would receive in a chapter 7 case.  The Plan will provide a greater recovery than under chapter 7 due to: (i) the value the Debtors believe can be generated through the Debtors' future revenues which will fund distributions to Unsecured Creditors; and (ii) by avoiding the additional expenses associated with conversion to a chapter 7 case.

## ARTICLE V

## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

Section 5.01    Allowed Professional Fee Claims.

The Debtors will pay Allowed Professional Fee Claims in full and in Cash within ten (10) days of such Claims becoming Allowed Professional Fee Claims pursuant to Section 8.01 herein or as soon as reasonably practicable thereafter, provided, however, that payment of an Allowed Professional Fee Claim may be made at a later date by agreement between the Debtors and the Professional.  The Debtors estimate that the Allowed Professional Fee Claims will total $240,000.

Section 5.02    Allowed Other Administrative Expense Claims.

The Debtors shall pay Allowed Other Administrative Expense Claims, including the Allowed fees of the Subchapter V Trustee, in full and in Cash on the latest of: (i) as soon as practicable following the Effective Date; (ii) thirty (30) days after such Claims become Allowed Other Administrative Expense Claims; (iii) the date upon which such Allowed Other Administrative Expense Claims become due in the ordinary course of business; and (iv) such other time as may be agreed in writing between the Debtors and the holder of the Allowed Other Administrative Expense Claim. Creditors seeking payment of Other Administrative Expense Claims have thirty (30) days following the occurrence of the Effective Date to file an application with the Bankruptcy Court requesting allowance and payment, or such Claims will be forever barred. The Debtors may settle and pay any Allowed Other Administrative Claim in their reasonable discretion without any further notice, and without any action, order, or approval of the Bankruptcy Court. CLC has agreed that the CLC Administrative Claim will be paid in accordance with the terms of the CLC Revolver. The Debtors estimate that the Allowed Other Administrative Expense Claims, excluding the CLC Administrative Claim, will total $20,000.

Section 5.03    Class 1 Claim: CLC Secured Claim.

Class 1 consists of the CLC Secured Claim. The Debtors estimate that the Claim in this class totals $637,057.00 secured by substantially all of the assets of both Debtors as of the date of this Plan. The payment of the CLC Secured Claim will come from the Debtors' operations. The Debtors will not make payments to CLC under the CLC Loan until after Allowed general unsecured claims have been paid their Pro-Rata share of distributions from the Contributed Cash Proceeds from Operations. CLC has agreed to extend the maturity date of the CLC Loan from January 1, 2025 to October 1, 2027.

Section 5.04    Class 2 Claims: Allowed Priority Claims.

Allowed Class 2 Priority Claims against the Debtors shall be paid in full in from the Contributed Cash Proceeds from Operations, beginning on the later of: (i) the dates of the distributions of the Contributed Proceeds from Operations described in Section 5.05 below until such Allowed Priority Claims are paid in full; (ii) thirty (30) days after such Claims become Allowed Priority Claims; and (iii) such other time as may be agreed to in writing between the Debtors and the holders of the Allowed Priority Claims. The Debtors estimate that the Allowed Class 2 Priority Claims will total $0.

Section 5.05    Class 3 Claims: Allowed General Unsecured Claims.

Allowed Class 3 General Unsecured Claims against the Debtors will be paid their Pro-Rata share of the portion of $613,191 in Cash from the proceeds of the Debtors' post-confirmation operations (the "**Contributed Proceeds from Operations**") which remains after the Class 2 Claims are satisfied.

The dates of distributions from the Contributed Proceeds from Operations shall be as follows: (i) $204,397 on or before twelve (12) months after the Effective Date; (ii) $204,397 on or before twenty-four (24) months after the Effective Date; (iii) $204,379 on or before thirty-six (36) months after the Effective Date (the "**Distribution Schedule**").

To the extent a Class 3 Claim is not an Allowed Claim on a distribution date, the Debtor will set aside such Holder's Pro-Rata distribution. If the Claim becomes Allowed, such amount will be promptly distributed to such Holder. If the Claim is disallowed, the set aside amount will be added to the next pro-rata distribution to Holders of Class 3 Claims.

The Debtors may, but are not required to, make the disbursements from Contributed Proceeds from Operations to Class 3 or any installment thereof sooner than required by the Distribution Schedule.

In addition to the payments from Contributed Proceeds from Operations, Allowed Class 3 General Unsecured Claims may be paid by the Litigation Trust, if one is established, their Pro-Rata share of recoveries from Net Trust Cash.

Section 5.06    Class 4 Claims:  Intercompany Claims.

Allowed Class 4 Intercompany Claims include Claims of the Debtors against each other. All Intercompany Claims are discharged and satisfied by virtue of the substantive consolidation of the Debtors pursuant to the Substantive Consolidation Order.

Section 5.07    Class 5 Claims: Equity Securities.

Class 5 Claims consist of the equity security interests of IVC Acquisition in the Debtors. IVC Acquisition will retain its ownership of the membership interests in the Debtor. In the event that Allowed Class 3 Claims are paid in full under this Plan, any remaining funds from Contributed Proceeds from Operations or Net Trust Cash shall be paid to Holders of Class 5 Claims, with the option of Class 5 Claims Holders to contribute such payments back to the reorganized Debtors consolidated in RSA 2-I.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS AND LEASES**

Section 6.01    Executory Contracts Assumed or Deemed Rejected.

Unless otherwise provided herein, all Executory Contracts of the Debtors that: (i) are listed on **Exhibit 4** to the Plan Supplement attached to this Plan; or (ii) have not (a) expired by their own terms and (b) otherwise been assumed prior to the Effective Date or pursuant to this Plan, will be deemed rejected under section 365 of the Bankruptcy Code on the Effective Date.

The Executory Contracts listed on **Exhibit 3** to the Plan Supplement attached to this Plan shall be deemed assumed. The Debtors may file an additional or amended schedule of assumed contracts or rejected Executory Contracts at any time prior to the Effective Date, as an amended **Exhibit 3** or **Exhibit 4** to the Plan Supplement, respectively. Debtors shall only be required to send notice of the filing of an amended schedule of assumed or rejected contracts to the counter-parties to such contracts which are added or omitted in the additional or amended schedule of assumed or rejected Executory Contracts. Parties in interest shall have ten (10) business days from the later of the date of filing of the schedules of assumed or rejected Executory Contracts or, in the case of counter parties to such contracts, the date of receipt of notice of the filing to

object to a schedule of assumed or rejected contracts filed pursuant to this Section (the "**Assumption or Rejection Objection Deadline**"). Such notice will be deemed to be received seven (7) days after the Debtors place such notice to a Person in the mail for delivery by the U.S. Postal Service. If no objections are filed on or before the Assumption or Rejection Objection Deadline, the contracts on the timely filed schedule of assumed contracts or rejected contracts shall be deemed assumed or rejected, respectively. The amount necessary to cure any assumed contract shall be the amount listed in **Exhibit 3**, unless the counter-party to an assumed contract files a timely objection to the scheduled cure amount on or before the Assumption or Rejection Objection Deadline and the Court enters an order allowing a different cure amount.

Notwithstanding anything to the contrary in this Section 6.01 of the Plan:

(a) treatment of the Debtors' assumption of their Executory Contracts with Casa Systems, Inc. will be governed by the terms of the order entered by the Court on or about February 23, 2023; treatment of the Debtors' assumption of certain Intercarrier Roamer Services Agreements will be governed by the terms of the order entered by the Court on November 11, 2022; treatment of the Debtors' assumption of certain agreements with Interop Technologies, LLC will be governed by the terms of the order entered by the Court on January 18, 2023; treatment of the Debtors' assumption of certain agreements with Communications Software Consultants, Inc. will be governed by the terms of the order entered by the Court on January 18, 2023;

(b) treatment of the Debtors' Executory Contracts with Vertical Bridge will be governed by the terms of the order entered by the Court on the Vertical Bridge Rejection Motion; treatment of the Debtors' rejection of their Executory Contract with the City of Peru will be governed by the terms of the order entered by the Court on February 23, 2023; treatment of the Debtors' rejection of their Executory Contract with the American Tower Corporation will ge governed by the terms of the order entered by the Court on February 23, 2023; and

(c) the Debtors or Post-Effective Date Debtors shall have until ninety (90) days after the Effective Date to file a notice of assumption or rejection of the Debtors' Executory Contracts ("**TNS Executory Contracts**") listed in **Exhibit 5** with Transaction Network Services ("**TNS**"). The Plan shall be considered a request pursuant Federal Rule of Bankruptcy Procedure 9006(b)(1)(1) for enlargement of time of the deadline imposed by section 365(d)(2) of the Bankruptcy Code for the Debtor to assume or reject an Executory Contract and the entry of a Confirmation Order shall constitute the Court's grant of such request. TNS shall have ten (10) business days from the date the Debtors serve the notice of assumption or rejection by placing it in the mail with the U.S. Postal Service for delivery to TNS to object to the assumption or rejection of the TNS Executory Contracts or any cure amount.

Section 6.02   <u>Bar Date for Rejection Damages</u>.

All proofs of claim with respect to Claims arising from the rejection of Executory Contracts pursuant to Section 6.01 of the Plan must, unless the Bankruptcy Court has ordered otherwise, be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date; provided that a proof of claim with respect to Claims arising from the rejection of TNS Executory Contracts must be filed no later than thirty (30) days after the date the Debtors serve

the notice of rejection of the TNS Executory Contracts by placing such notice in the mail with the U.S. Postal Service for delivery to TNS.  The Claims of any Person arising from the rejection of Executory Contracts or unexpired leases pursuant to Section 6.01 of the Plan that fails to timely file a proof of claim will be discharged under section 1141(d) of the Bankruptcy Code and forever barred from assertion against the Debtors or their assets.

## ARTICLE VII

## MEANS OF IMPLEMENTATION OF THE PLAN

The Plan will be effectuated as follows:

Section 7.01    <u>Substantive Consolidation.</u>

The Substantive Consolidation Order shall contain one or more provisions substantively consolidating the Debtors' Estates into the Estate of RSA 2-I.  On the Confirmation Date, and except as otherwise provided in the Plan:  (i) all guaranties of any Debtor of the payment, performance or collection of the other Debtor shall be deemed eliminated and cancelled; (ii) any obligation of any Debtor and guaranties thereof executed by the Debtor shall be treated as a single obligation and multiple Claims against such entities on account of such joint obligations, shall be treated and allowed only as a single Claim against the consolidated Debtors; and (iii) each Claim filed or to be filed against either Debtor shall be deemed filed against the consolidated Debtors and shall be deemed a single Claim against and a single obligation of the consolidated Debtors.  On the Confirmation Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guaranties of collection, payment or performance made by the Debtors as to the obligations of the other Debtor shall be released and of no further force and effect.  Except as set forth in this Section 7.01, such substantive consolidation shall not (other than for purposes related to the Plan) cause any Debtor to be liable under the Plan for any Claim for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation.  On the Confirmation Date, the Intercompany Claims of one of the Debtors against the other Debtor shall be extinguished and cancelled.

Unless the Bankruptcy Court has approved the substantive consolidation of the Estates by a prior order, this Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors as provided in this Section 7.01.  If no objection to substantive consolidation is timely filed and served by any holder of an Impaired Claim affected by the Plan as provided herein on or before the deadline to object to this Plan set by the Bankruptcy Court, or if any such objection is resolved by the parties or overruled by the Bankruptcy Court, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Estates and any objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

Upon the substantive consolidation of the Estates into the Estate of RSA 2-I, the Estate of RSA 2-II shall be closed.  Upon such event, RSA 2-I may file all Causes of Action and objections to Claims in RSA 2-I's Case, and not in RSA 2-II's Case, notwithstanding the fact

that the transferring Debtor (in an Avoidance Action) or the Debtor against whom the Claim was filed (in a Claim objection proceeding) may be RSA 2-II.

Section 7.02    <u>Retention of Equity.</u>

The Equity Security Holders will retain their Interests in the Debtors.

Section 7.03    <u>Vesting of Assets.</u>

On the Effective Date, the Assets of the Debtors' Estates, will vest in RSA 2-I. Thereafter, the Post-Effective Date Debtors may operate their business as RSA 2-I and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Court. As of the Effective Date, all property of the consolidated Post-Effective Date Debtors shall be free and clear of all Claims and Liens, except as specifically provided in this Plan or the Confirmation Order.

Section 7.04    <u>Retention of Causes of Action</u>.

All Causes of Action shall survive confirmation of this Plan and the commencement of prosecution of Causes of Action shall not be barred or limited by any res judicata or estoppel, whether judicial, equitable or otherwise, based upon confirmation of the Plan. The Debtors' rights to commence and prosecute Causes of Action shall not be abridged or materially altered in any manner by reason of confirmation of the Plan.

Within ninety (90) days after the Effective Date, the Debtors and/or Post-Effective Date Debtors shall obtain a third-party expert insolvency analysis of the Debtors' operations at the time of any distributions or payments made by the Debtors to the former equity holders of the Debtors or their predecessors ("**Former Equity Holders**") within four (4) years prior to the Petition Date (the "**Insolvency Analysis**"). If the Insolvency Analysis shows that the Debtors were insolvent at the time of such transfers or made insolvent as a result of such transfers and the Debtors or Post-Effective Date Debtors determine in their business judgment that viable and valuable Trust Causes of Action exist, then the Debtors will create and place the Trust Causes of Action into a Litigation Trust in accordance with Sections 7.14 and 7.15, for the purpose of pursuing the Trust Causes of Action. The commencement of prosecution of Trust Causes of Action shall not be barred or limited by any res judicata or estoppel, whether judicial, equitable or otherwise, based upon confirmation of the Plan. The Litigation Trust's rights to commence and prosecute Trust Causes of Action shall not be abridged or materially altered in any manner by reason of confirmation of the Plan

Section 7.05    <u>Funding</u>.

The Plan will be funded by the disposable income from the Debtors' business operations and, in the event a Litigation Trust is created, the Net Trust Cash.

Section 7.06    <u>Management.</u>

The Debtors' current managers shall continue to operate and manage the Post-Effective Date Debtors. The Debtors may hire new officers, as necessary after the Effective Date.

Section 7.07 <u>Continued    Corporate    Existence    Between    the
Confirmation Date and the Effective Date</u>.

Between the Confirmation Date and the Effective Date, the Debtors shall continue in possession and control and continue to act in accordance with the Bankruptcy Code.

Section 7.08    <u>Objections to Claims</u>.

Each Claim shall be allowed or disallowed, as the case may be, in such amount as the Bankruptcy Court shall determine, whether prior to or following Confirmation, and whether pursuant to the Plan or otherwise, except that after the Effective Date, the Post-Effective Date Debtors may settle or compromise any objections and/or controversies regarding Claims without notice or further order of the Bankruptcy Court.  The deadline to file all objections to Claims shall be no later than one-hundred and eighty (180) days after the Effective Date, which deadline may be extended by the Bankruptcy Court for good cause shown.  The Trustee shall have non-exclusive standing to object to any Claim against the Debtors asserted by any party who is a defendant to the Trust Causes of Action.

Section 7.09    <u>No Distribution on Disputed Claims</u>.

Notwithstanding any provision of the Plan specifying the time for payment of distributions to holders of Claims, no payment or distribution shall be made to the holder of any Disputed Claim until the time such Claim has been determined to be an Allowed Claim. Notwithstanding the existence of a Disputed Claim in a Class to which a distribution under this Plan is due, such distribution to other creditors shall not be affected by any delay in the resolution and/or allowance of the Disputed Claim.  Upon the allowance of any Disputed Claim, the holder shall be paid the amount that such holder would have received had its Claim been an Allowed Claim on the Effective Date.

Section 7.10    <u>Section 1146 Exemption</u>.

Under, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument whatsoever in furtherance of or in connection with the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, mortgage tax, real estate transfer tax, mortgage recording tax, filing or recording fee, or other similar tax or governmental assessments.

Section 7.11    <u>Documentation Necessary to Release Liens</u>.

Upon payment in full of the CLC Secured Claim, CLC shall execute and deliver any documents necessary to release all Liens arising under any applicable security agreement or non-bankruptcy law (in recordable form if appropriate) in connection with its claims against the Debtors and such other documents as the Debtors may reasonably request.

Section 7.12    <u>Appropriate Remedies</u>.

In the event of a material default of the Debtors under the terms of the Plan, that is not cured within 120 days of written notice of a default, the Debtors shall market and sell the assets

of the Debtors. After the secured claims against the Debtors' assets have been satisfied, the proceeds of sale will be paid to the creditors of the Debtors, first to debt incurred post-confirmation, then to pay Allowed Administrative Claims, then to pay Allowed Priority Claims, and then to pay Allowed general unsecured claims.

Section 7.13   <u>Disbursing Agent and Distribution Record Date.</u>

All payments under this Plan will be made by the Disbursing Agent.  The distribution record date shall be the close of business on Effective Date, at which time all transfer ledgers, transfer books, registers and any other records maintained by the Debtors or their agents with respect to ownership of any Claims will be closed and, for purposes of the Plan, there shall be no further changes in the record holders of such Claims.

Section 7.14   <u>Avoidance Actions</u>

The Debtors and Post-Effective Date Debtors will investigate and, if appropriate in their business judgment, pursue Avoidance Action (other than the Trust Causes of Action) and any proceeds or recoveries of the Avoidance Actions will be used to fund the Contributed Proceeds from Operations.  The Debtors made approximately $1,778,000 in payments to vendors which aggregated over $7,750 per vendor within 90 days prior to the Petition Date, however, approximately $1,000,000 of such payments were made to vendors whose contracts were assumed and a significant portion of the remaining payments appear to be in the ordinary course of the Debtors' business.  The Debtors made approximately $2.3 million in payments to Marseilles Cellular, Inc. within one year prior the Petition Date, however, substantially all of those payments appear to be made in the ordinary course of business for payroll of employees.  Therefore, the Debtors do not know the value of Avoidance Actions, but believe that recovery of Avoidance Actions will not exceed $200,000.

Section 7.15   <u>The Litigation Trust.</u>

If a Litigation Trust is created pursuant to Section 7.04, the Debtors shall fund the Litigation Trust from $50,000.00 of the Contributed Proceeds from Operations within sixty (60) days of the creation of the Litigation Trust.  The Trustee shall be responsible for liquidating the Trust Assets, analyzing and pursuing Trust Causes of Action (including filing and pursuing objections to Claims of defendants to such action to the extent beneficial to the Litigation Trust), making distributions of Net Trust Cash to the Holders of Class 3 Claims and Class 5 Interest as beneficiaries of the Litigation Trust in the priorities established by this Plan, and all other activities typically related to trust administration.

Section 7.16   <u>Creditor Trustee/Post-Confirmation Management</u>

If a Litigation Trust is created pursuant to Section 7.04, continuing through the date that a final decree closing the Chapter 11 Cases is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Trustee shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Trust Assets.  In addition to the foregoing, for all matters arising in, arising under or related to the Chapter 11 Cases, the Trustee shall: (i) have the

right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction; (ii) have the right to obtain records of, or related to, the Debtors (including, without limitation, bank statements and cancelled checks); (iii) be entitled to notice and opportunity for hearing; (iv) be entitled to participate in all matters brought before the Bankruptcy Court, including, but not limited to, adversary proceedings related to the Trust Causes of Action; (v) have exclusive standing (including derivative standing) to pursue Trust Causes of Action on behalf of the Debtors; (vi) be entitled to request the Bankruptcy Court to enter a final decree closing the Chapter 11 Cases; and (vii) receive notice of all applications, motions and other papers and pleadings set before the Bankruptcy Court in these Chapter 11 Cases.

## ARTICLE VIII

## BAR DATES FOR ADMINISTRATIVE CLAIMS

Section 8.01    Bar Date for Administrative Claims.

Notwithstanding anything to the contrary or alternative provided by prior orders of the Bankruptcy Court regarding allowance or payment of Professional Fee Claims, all Persons requesting payment of any Administrative Claim, including but not limited to Professional Fee Claims, and Other Administrative Claims, must file applications for payment no later than thirty (30) days after the Effective Date. Any Administrative Claims for which applications are not timely filed in accordance herewith will be deemed discharged and barred from being asserted against the Debtors; *provided that* previously approved or Allowed applications for Administrative Claims do not need to be re-filed.

## ARTICLE IX

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

Section 9.01    Conditions to Confirmation.

The Plan shall not be confirmed unless and until the following conditions have occurred or have been waived in writing by the Debtor:

(a)    the Court approves this Plan and the disclosures contained herein and does not order the Debtors under section 1181(b) of the Bankruptcy Code that section 1125 of the Bankruptcy Code applies; and

(b)    the Court enters the Confirmation Order in form and substance acceptable to the Debtors.

Section 9.02    Conditions to Effective Date.

The Effective Date shall occur only if, unless waived in writing by the Debtors:

(a)    the Confirmation Order has been entered and has not been vacated, reversed, stayed, enjoined or restrained by order of a court of competent jurisdiction; and

(b)    the deadline for an appeal of the Confirmation Order has lapsed.

## ARTICLE X

## EFFECTS OF CONFIRMATION

Section 10.01 <u>Debtors' Discharge</u>.

Pursuant to section 1192 of the Bankruptcy Code, effective upon the completion of payments in the Distribution Schedule, the Plan will discharge the Debtors from any and all Claims including any Claim, demands, Liens, and Interests that arose from any agreement of the Debtors entered into, or obligations of the Debtors incurred before the Effective Date, or from any conduct of the Debtors prior to the Effective Date or that otherwise arose prior to the Effective Date, including, without limitation, all interest, if any, on such debts, whether such interest accrued before or after the Petition Dates of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Claim was Filed or deemed Filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of Assets and Liabilities of the Debtors, (ii) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (iii) such the Holder of the Claim has voted on or accepted the Plan.

Section 10.02 <u>Injunction</u>.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE CONFIRMATION DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD LIENS, CLAIMS OR INTERESTS IN OR AGAINST THE DEBTORS ARE, WITH RESPECT TO OR ON ACCOUNT OF ANY SUCH LIENS, CLAIMS OR INTERESTS, PERMANENTLY ENJOINED FROM:    (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (II) ENFORCING AGAINST, LEVYING UPON OR ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT) THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (III) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY, OF ANY JUDGMENT, AWARD, DECREE, CLAIM OR ORDER AGAINST THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (IV) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIENS, CLAIMS OR INTERESTS OF

ANY KIND AGAINST OR IN THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (V) OTHER THAN AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, ASSERTING ANY RIGHT OF SETOFF, SUBORDINATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTORS, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; AND (VI) TAKING ANY ACTIONS IN ANY PLACE AND IN ANY MANNER WHATSOEVER THAT DO NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN.

Section 10.03  Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in these Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect through the imposition of the injunction set forth in Section 10.02 of the Plan.

Section 10.04  Exculpation.

The Debtors nor any of their members, officers, directors, shareholders, employees, advisors, attorneys or agents or representatives acting in such capacity, will have or incur any liability to, or be subject to any right of action by, any Person or entity, for any act or omission in connection with, relating to or arising out of, the Cases or the pursuit of confirmation of the Plan, except to the extent arising out of fraud, willful misconduct or gross negligence, and in all respects will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Section 10.05  Other Documents and Actions.

The Debtors are authorized to execute such documents and take such other action as is necessary to effectuate the transactions contemplated by the Plan.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.01  Headings for Convenience Only.

The headings in the Plan are for convenience of reference and will not limit or otherwise affect the meanings thereof.

Section 11.02  Binding Effect of Plan.

The provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, and any holder of a Claim or holder of an Equity Security treated herein or any entity named or referred to in the Plan and each of their respective representatives, and, to the fullest

extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

Section 11.03  <u>Modification of the Plan</u>.

The Debtors may alter, amend or modify the Plan and related documents under section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Effective Date. After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may, so long as the treatment of holders of Claims and holders of Equity Securities are not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, Disclosure Statement, or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan.

Section 11.04  <u>Final Order</u>.

Except as otherwise expressly provided in the Plan, the Debtors may waive any requirement in the Plan for a Final Order.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

Section 11.05  <u>Severability</u>.

Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Equity Security, such provision shall be unenforceable as to all holders of Claims or Equity Securities to the specific holder of the Claim or Equity Security, as the case may be, as to which the provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.  The Debtors reserve the right not to proceed with Confirmation or consummation of the Plan if any such ruling occurs.

Section 11.06  <u>Governing Law</u>.

EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF ILLINOIS OR THE UNITED STATES OF AMERICA.

Section 11.07  <u>Notices</u>.

Any notice required or permitted to be provided under this Plan shall be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; (iii) electronic mail; or (iv) reputable overnight delivery service, freight prepaid, with copies to the following parties and others, if any, set forth in the Plan Supplement:

If to the Debtors:

Daniel E. Hopkins
CFO
Illinois Valley Cellular
200 Riverfront Dr.
Marseilles, Illinois 61341
dhopkins@cellonenation.com

and

Shelly A. DeRousse, Esq.
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone:  (312) 360-6000
E-mail:  sderousse@freeborn.com

If to the United States Trustee:

Kimberly Bacher, Esq.
Office of the United States Trustee
219 S. Dearborn St., Room 873
Chicago, IL 60604
Telephone: (312) 886-3327
E-mail: kimberly.bacher@usdoj.gov

If to the Subchapter V Trustee:

Robert Handler
Commercial Recovery Associates, LLC
205 W. Wacker Drive, Suite 918
Chicago, Illinois 60606
Phone: (312) 845-5001 x221
E-mail: rhandler@com-rec.com

Section 11.08  Filing of Additional Documents.

To the extent not filed with the Plan, on or before the Plan Supplement Filing Date, the Debtors will file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Section 11.09  Lapsed Distributions.

Lapsed Distributions will revert to the Estates and be distributed Pro Rata in accordance with the priorities of the Plan.

Section 11.10  Undeliverable and Unclaimed Distributions.

If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder of an Allowed Claim will be made unless the Debtors are notified in writing of the holder's current address within thirty (30) days after the distribution date.  Upon receipt of the notification, the Debtors will remit the distribution to the holder of the Allowed Claim without interest.  All claims for undeliverable distributions or notice of address must be made within thirty (30) days after the distribution date or else the distribution will be deemed to be a Lapsed Distribution.  Nothing in the Plan will require the Debtors to attempt to locate any holder of an Allowed Claim.  For any distribution which becomes a Lapsed Distribution, the Debtors shall be deemed to have made such distribution for the purpose of satisfying the amount required under this Plan of Contributed Proceeds from Operations or any other contribution requirement.

Section 11.11  Defenses with Respect to Claims.

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors, with respect to any Claim, including but not limited to all rights in respect of legal and equitable defenses to setoffs or recoupments against such Claims.

Section 11.12  No Injunctive Relief.

No Claim shall under any circumstances be entitled to specific performance or other injunctive, equitable or prospective relief.

Section 11.13  No Admissions.

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of any classification of any Claim.

Section 11.14  Written Agreement.

Any provision of this Plan which requires written agreement may be satisfied by email or other electronic communication indicating agreement of the relevant party.

Section 11.15  <u>Minimal Distribution.</u>

If any Pro-Rata distribution to a holder of an Allowed Claim under this Plan would be in an amount less than $50.00, the Debtors are not required to make such distribution and for the purposes of satisfying the amount required under this Plan of Contributed Proceeds from Operations, the distributions shall be treated as having been made.

## ARTICLE XII

## RETENTION OF JURISDICTION

Section 12.01  <u>Exclusive Jurisdiction of Bankruptcy Court</u>.

The Bankruptcy Court will retain jurisdiction over these Cases for the following purposes:

(a)    Resolution of any and all objections to Claims.

(b)    Unless otherwise determined by a court of competent jurisdiction, determination of all questions and disputes regarding all Causes of Action, controversies, disputes or conflicts, whether or not subject to pending actions as of the Confirmation Date, between: (i) the Debtors and any other Person relating to any Claim or any term of the Plan or any transaction or act occurring under or pursuant to the Plan; or (ii) otherwise under the Plan, the Confirmation Order or any other order issued by the Bankruptcy Court in connection with these Cases.

(c)    The correction of any defect and the curing of any omission or inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan.

(d)    Modification of the Plan after the Confirmation Date pursuant to the Bankruptcy Code and the Bankruptcy Rules.

(e)    Allowance of all Claims and applications for payment of Administrative Claims and Professional Fee Claims, and Professional's expenses which may be paid by the Debtors pursuant to the provisions of the Plan and the Bankruptcy Code and resolution of all disputes pertaining thereto.

(g)    Determination of all questions and disputes regarding or relating to any loans to the Debtors approved by the Bankruptcy Court pursuant to section 364 of the Bankruptcy Code.

(h)    Enforcement of any order entered by the Bankruptcy Court.

(i)    Entry of a final order confirming substantial consummation of the Plan and closing the Cases.

Dated:  February 24, 2023

**ILLINOIS VALLEY CELLULAR RSA 2-I, LLC and ILLINOIS VALLEY CELLUAR RSA 2-II, LLC.**

By: /s/ Shelly A. DeRousse
      One of Its Attorneys

**FREEBORN & PETERS LLP**
Shelly A. DeRousse
Jason J. Ben
Elizabeth L. Janczak
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel:    312.360.6000
Fax:    312.360.6520
Email:  sderousse@freeborn.com
        jben@freeborn.com
        ejanczak@freeborn.com

*Counsel for the Debtors*